# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEANETTE CHANDLER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:18-cv-01209-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **the Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Jeanette Chandler seeks judicial review of a final adverse decision by the Commissioner of Social Security. The Commissioner denied Ms. Chandler's claims for disability insurance benefits and supplemental security income. After careful consideration of the record, the Court remands for additional proceedings.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the proper defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I. PROCEDURAL HISTORY

Ms. Chandler applied for disability insurance benefits and supplemental security income. (Doc. 6-3, p. 15; Doc. 6-4, pp. 36, 37). Ms. Chandler alleges that her disability began on November 23, 2015. (Doc. 6-3, p. 15; Doc. 6-3, p. 37).[2] The Commissioner initially denied Ms. Chandler's claims. (Doc. 6-3, p. 15; Doc. 6-4, pp. 36, 37). Ms. Chandler requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-3, p. 15; Doc. 6-5, pp. 10-11). The ALJ issued an unfavorable decision. (Doc. 6-3, pp. 15-27). The Appeals Council declined Ms. Chandler's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final for appellate review. *See* 42 U.S.C. §§ 405(g) and 1383(c).

# II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r, Soc. Sec. Admin.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

---

[2] Social Security disability insurance benefits are available to insured claimants only. An insured claimant is one who "worked long enough and paid Social Security taxes. Unlike [disability insurance] benefits, [supplemental security income] benefits are not based on . . . prior work or a family member's prior work." https://www.ssa.gov/ssi/text-over-ussi.htm (last visited Oct. 3, 2019). A disability onset date is part of the analysis of a claim for disability insurance benefits. When a claimant seeks supplemental security income, the ALJ must verify that the claimant has not worked in a gainful capacity since filing the application.

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is something more than a mere scintilla, but less than a preponderance. If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotation marks and citations omitted); *see also Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (same). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r, Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotation marks and citation omitted).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court ordinarily must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.  SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

Here, the ALJ found that Ms. Chandler met the insured status requirements for disability insurance benefits through December 31, 2015. (Doc. 6-3, p. 17). Ms. Chandler had not engaged in substantial gainful activity since November 23, 2015, the alleged amended onset date. (Doc. 6-3, p. 18). The ALJ determined that Ms. Chandler suffered from five severe impairments: obesity, osteoarthritis, asthma, anxiety, and depression. (Doc. 6-3, p. 18). The ALJ determined that Ms. Chandler's hypertension and residual symptoms from a 2017 car accident were non-severe impairments. (Doc. 6-3, p. 18). Based on his review of the medical evidence, the ALJ concluded that Ms. Chandler did not have an impairment or a combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 18).

Given these impairments, the ALJ determined that Ms. Chandler had the RFC to "perform light work" with the following exceptions:

The claimant is unable to climb ladders, ropes, or scaffolds; perform around hazards; perform commercial driving; or perform in concentrated exposure to extreme hot or cold temperatures, wetness, humidity, or environments of fumes, odors, dust, gases, poor ventilation, etc. The claimant can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. The claimant can understand and remember simple instructions. The claimant can carry out simple instructions and sustain attention to routine or familiar tasks for extended periods. The claimant should have no production quota and should avoid rapid changes and multiple demands. Any contact with the public or co-workers should be no more than occasional and brief (no more than 30 minutes at one time). The claimant can accept and respond to feedback that is supportive and can adapt to infrequent, well explained changes in the work setting expectations.

(Doc. 6-3, p. 21). Based on this RFC and vocational expert testimony, the ALJ concluded that Ms. Chandler could not perform her past relevant work as a fast food worker and house cleaner. (Doc. 6-3, p. 25). Relying on the Medical-Vocational Guidelines and expert testimony, the ALJ found that Ms. Chandler was capable of doing light jobs including cashier II, power screwdriver operator, and marker. (Doc. 6-3, p. 26). Accordingly, the ALJ determined that Ms. Chandler was not under a disability within the meaning of the Social Security Act. (Doc. 6-3, p. 27).

## IV. ANALYSIS

Ms. Chandler challenges the ALJ's RFC determination. (Doc. 8, p. 4). An RFC "is an assessment, based on all relevant medical and other evidence, of a claimant's remaining ability to work despite his impairment." *Castle v. Colvin*, 557 Fed. Appx. 849, 852 (11th Cir. 2014). The ALJ determined that despite her physical

and mental impairments, Ms. Chandler could perform a reduced range of light work.

Under the Social Security regulations, "light work":

> involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds. Even though the
> weight lifted may be very little, a job is in this category when it requires
> a good deal of walking or standing, or when it involves sitting most of
> the time with some pushing and pulling of arm or leg controls. To be
> considered capable of performing a full or wide range of light work,
> you must have the ability to do substantially all of these activities. If
> someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss
> of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). In the RFC for light work, the ALJ placed no limit on Ms.

Chandler's ability to stand and walk or her need for breaks. *See* p. 5, above; (Doc.

6-3, p. 24).

At the administrative hearing, Ms. Chandler testified that she can stand for

only ten minutes at a time. (Doc. 6-3, p. 45). Dr. Ashley Holdridge, a doctor of

osteopathic medicine (DO) who Ms. Chandler saw in January 2015 for a consultative

physical examination, limited Ms. Chandler's ability to stand and walk "to four

hours with frequent breaks." (Doc. 6-11, pp. 95, 99).[3] Ms. Chandler's testimony

about her ability to stand and Dr. Holdridge's restriction on Ms. Chandler's ability

to stand and walk are inconsistent with the ALJ's RFC for Ms. Chandler.

---

[3] "Doctors of Osteopathic Medicine, or DOs, are fully licensed physicians who practice in all areas
of medicine [and who] [e]mphasiz[e] a whole-person approach to treatment and care . . . . DOs
receive special training in the musculoskeletal system, [the] body's interconnected system of
nerves, muscles and bones." (last visited Apr. 19, 2019).

With respect to Ms. Chandler's testimony about her limited ability to stand, the ALJ found that Ms. Chandler's "medically determinable impairments could reasonably be expected to cause some symptoms and functional limitations. However, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Doc. 6-3, p. 23). With respect to Dr. Holdridge's opinion regarding Ms. Chandler's limited ability to stand and walk during a workday, the ALJ gave "some good weight" to Dr. Holdridge's assessment of Ms. Chandler's physical capabilities, but the ALJ found that Dr. Holdridge's "opinions are not based on the evidence in its entirety (Exhibit B10F)." (Doc. 6-3, p. 25). The ALJ determined that Dr. Holdridge's conclusion about Ms. Chandler's limited ability to stand and walk and Ms. Chandler's need for frequent breaks was inconsistent with Dr. Holdridge's "findings [and] the overall evidence of record." (Doc. 6-3, p. 25).[4]

---

[4] The ALJ's conclusory statements regarding Dr. Holdridge's functional assessment of Ms. Chandler's ability to stand and walk and her need for frequent breaks hampers appellate review under the substantial evidence standard. *Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. 2010) ("The ALJ must state the grounds for his decision with clarity to enable . . . meaningful review.") (citing *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). Because the ALJ elsewhere in his opinion discussed his analysis of some of the medical evidence, the Court assumes for purposes of this opinion that that analysis informs the ALJ's conclusion regarding Dr. Holdridge's functional assessment of Ms. Chandler. *See Laurey v. Comm'r, Soc. Sec. Admin.*, 632 Fed. Appx. 978, 987 (11th Cir. 2015).

With respect to the "overall evidence of record" as it pertains to Ms. Chandler's ability to stand and walk, the ALJ stated:

> Many of the physical allegations the claimant offered at the hearing were related to injuries sustained in a recent motor vehicle accident, but those limitations are expected to improve within 12 months. Despite her osteoarthritis and obesity-related pain, the claimant generally exhibits a normal gait, although she exhibited an antalgic gait at the January 2015 consultative examination (Exhibits B10F, B11F, and B15F). She has also generally maintain[ed] full strength and normal sensation (Exhibits B10F, B18F, and B20F). Diagnostic imaging has revealed only mild arthritic changes (Exhibits B6F and B20F). With respect to her obesity, Dr. Retan has advised her to exercise, which indicates that her body habitus may exacerbate her pain but does not itself limit her movement (Exhibits B12F and B16F). She has alleged severely limited activities, which is inconsistent with the activity level she reported at the consultative examinations (Exhibits B12E, B10F, and B11F). Her allegation that she can stand for only ten minutes is also undermined by her admission that she walks for exercise.

(Doc. 6-3, p. 24). As part of his examination of Ms. Chandler's ability to stand and walk, the ALJ also considered a collection of treatment records from Dr. J. Walden Retan, a treating physician. (Doc. 6-3, pp. 22-23).

The Court must review Dr. Holdridge's findings and the "overall evidence of record" on which the ALJ relied, including Dr. Retan's treatment records, to determine whether substantial evidence supports the ALJ's decision to discount Dr. Holdridge's opinion about Ms. Chandler's limited ability to stand and walk and her need for frequent breaks in a workday.

*Dr. Holdridge's findings*

As pertinent to Dr. Holdridge's stand/walk restrictions, when Ms. Chandler saw Dr. Holdridge, Ms. Chandler identified bilateral knee pain and low back pain as her chief complaints. (Doc. 6-11, p. 95).

Dr. Holdridge summarized Ms. Chandler's medical history concerning knee pain as follows:

> On November 17, 2014, Cooper Green Primary Care progress note documents old trauma with increasing knee pain caused her to be unable to work, morbid obesity with patellofemoral pain, non-operative disease. Per note, she needs to lose 100 pounds and begin an exercise program. On February 17, 2014, x-ray report of the right knee shows minor arthritic change in the medial compartment with the same minimal spurring in the medial femoral and tibia condyles. There is prominent calcification at their origin at the mediocollateral ligament from an old injury, small effusion is present. Mild arthritic changes are present in the right knee. May 15, 2013, Cooper Green [P]rimary [C]are note documents bilateral knee pain. On October 26, 2011, left wrist x-ray documents impacted and slightly angulated comminuted fracture of the distal radius.

(Doc. 6-11, p. 95).[5] According to Dr. Holdridge's notes, Ms. Chandler's knee pain dates to 2004 when Ms. Chandler "was thrown off the back of a truck." (Doc. 6-11,

---

[5] Arthritic change in the medial compartment, medial femoral, and tibia condyles means "loss of cartilage padding" around the bones of the knee joint. https://paleyinstitute.org/centers-of-excellence/cartilage-repair/anatomy-of-the-knee-joint/ (last visited Apr. 19, 2019). Calcification occurs "when calcium builds up [and hardens] in body tissue, blood vessels or organs." https://www.healthline.com/health/calcification (last visited Apr. 19, 2019). The mediocollateral ligament or MCL "is a band of tissue on the inside of [the] knee [which] connects [the] thighbone to the bone of [the] lower leg. The MCL keeps the knee from bending inward." https://www.uofmhealth.org/health-library/abn2411 (last visited Apr. 19, 2019). "Knee effusion, or water on the knee, occurs when excess fluid accumulates in or around the knee joint." https://www.medicalnewstoday.com/articles/187908.php (last visited Apr. 19, 2019). A distal

p. 95).  Ms. Chandler reported wearing a brace and using crutches after the accident. (Doc. 6-11, p. 95).  Ms. Chandler told Dr. Holdridge that her bilateral knee pain had "progressively worsened especially since 2012 when she gained 40 pounds."  (Doc. 6-11, p. 95).[6]  Ms. Chandler described her pain as "aching, throbbing, and shooting." (Doc. 6-11, p. 95).  Ms. Chandler reported that her knee "pops all the time and it gives out."  (Doc. 6-11, p. 95).  Dr. Holdridge recorded that "walking, standing, or bending" exacerbated Ms. Chandler's knee pain.  (Doc. 6-11, p. 95).  Ms. Chandler explained that she used heating pads and pain medication to alleviate the pain.  (Doc. 6-11, p. 95).

Ms. Chandler told Dr. Holdridge that her lower back pain began after she gained weight in 2012.  (Doc. 6-11, p. 96).  Ms. Chandler indicated that the pain does not radiate, tingle, or cause numbness; "[i]t just hurts."  (Doc. 6-11, p. 96). According to Ms. Chandler, sitting too long, standing, and walking beyond 15 feet exacerbates her back pain.  (Doc. 6-11, p. 96).

Concerning daily activities, Ms. Chandler reported to Dr. Holdridge that she was cooking, washing dishes, and doing laundry.  She could dress herself but sometimes needed help putting on socks.  (Doc. 6-11, p. 96).  Ms. Chandler reported

---

radius fracture is a broken wrist.  https://orthoinfo.aaos.org/en/diseases--conditions/distal-radius-fractures-broken-wrist/ (last visited Apr. 19, 2019).

[6] During the consultation with Dr. Holdridge, Ms. Chandler was five feet and five inches tall and weighed 261 pounds.  (Doc. 6-11, p. 97).

that she did not vacuum or mop.  (Doc. 6-11, p. 96).  Ms. Chandler stated that she

had no hobbies, and she spent her days watching TV or lying down.  (Doc. 6-11, p.

96).

After examining Ms. Chandler, Dr. Holdridge described Ms. Chandler's gait

as antalgic and "slightly wide-based."  (Doc. 6-11, p. 97).  Ms. Chandler "was unable

to walk on her toes, . . . heels, or heel-to-toe[,]" and she did not attempt squatting.

(Doc. 6-11, p. 97).  Dr. Holdridge reported that Ms. Chandler "was able to get onto

the [examining] table, but [that she] did have difficulty getting from a supine to a

sitting position and needed assistance."  (Doc. 6-11, p. 97).  Dr. Holdridge found

that Ms. Chandler had:

> some mild tenderness to palpation in the left wrist as well as both knees
> bilaterally.  She appeared to have a hyperlordoctic curvature in her back
> as well as tenderness to palpation in her lumbar paraspinals as well as
> her sacroiliac joints, right greater than left.

(Doc. 6-11, pp. 98-99).

On January 29, 2015, Dr. Holdridge diagnosed Ms. Chandler with probable

osteoarthritis in both knees, lower back hyperlordosis and probable arthritic changes

with sacroilitis on the right, hypertension, asthma, and morbid obesity.  (Doc. 6-11,

p. 99).[7]   Given Ms. Chandler's "obesity[,] probable osteoarthritis and back

---

[7] Osteoarthritis "is the most common form of arthritis in the knee" and occurs when "the cartilage in the knee joint gradually wears away."   https://orthoinfo.aaos.org/en/diseases--conditions/arthritis-of-the-knee/ (last visited Apr. 19, 2019)

pathology[,]" Dr. Holdridge limited Ms. Chandler's ability to stand and walk "to four hours with frequent breaks." (Doc. 6-11, p. 99). Dr. Holdridge found that Ms. Chandler's probable osteoarthritis would limit Ms. Chandler's ability to climb stairs, use ladders, stoop, crouch, kneel, and crawl. (Doc. 6-11, p. 100).[8]

In Ms. Chandler's RFC, the ALJ accounted for the latter limit on climbing, crouching, kneeling, and crawling but not the former limit on standing and walking. (Doc. 6-3, p. 21) ("The claimant can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl."). The ALJ discounted Dr. Holdridge's limit on walking and standing at least in part because the ALJ believed that Dr. Holdridge's finding that Ms. Chandler had an antalgic gait was an outlier. Antalgic means "marked by or being an unnatural position or movement assumed by someone to minimize or

---

"Hyperlordosis is . . . an excessive spine curvature in the lower back. . . . [It] can cause muscle tightening and stiffness . . . . People with hyperlordosis may experience mild to severe lower back pain, which may worsen with movement." https://www.medicalnewstoday.com/articles/321959.php (last visited Sept. 21, 2019).

"Sacroiliitis (say-kroe-il-e-I-tis) is an inflammation of one or both of your sacroiliac joints — situated where your lower spine and pelvis connect. Sacroiliitis can cause pain in [a person's] buttocks or lower back, and can extend down one or both legs. Prolonged standing or stair climbing can worsen the pain." https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747 (last visited Sept. 21, 2019).

[8] Importantly, Dr. Holdridge's 2015 restriction on Ms. Chandler's ability to walk and stand preceded Ms. Chandler's accident in 2017. Thus, to the extent that the ALJ discounted Ms. Chandler's complaints of knee pain because he attributed those complaints to injuries stemming from the 2017 accident – injuries which the ALJ believed would resolve in time, the ALJ overlooked the preexisting 2015 diagnosis that included functional limits on Ms. Chandler's ability to walk and stand. (Doc. 6-3, p. 24) (ALJ's finding that "[m]any of the physical allegations the claimant offered at the hearing were related to injuries sustained in a recent motor vehicle accident, but those limitations are expected to improve within 12 months").

alleviate pain or discomfort (as in the leg or back)[.]" https://www.merriam-webster.com/medical/antalgic (last visited Aug. 7, 2019). Citing Exhibits B10F, B11F, and B15F, the ALJ stated that Ms. Chandler generally exhibited a normal gait. (Doc. 6-3, p. 24).

Exhibit B10F is the report in which Dr. Holdridge observed that Ms. Chandler walked with an antalgic gait in January 2015. (Doc. 6-11, pp. 95-100). Exhibit B11F is the report that Dr. Sally Gordon, a licensed psychologist, prepared after evaluating Ms. Chandler's mental health in February 2015. (Doc. 6-12, pp. 2-4). Dr. Gordon stated that on the day she saw Ms. Chandler, Ms. Chandler's "posture, balance, gait, and spontaneous use of both upper extremities were normal, with no gross or fine motor impairments evident." (Doc. 6-12, p. 3).

Exhibit B15F consists of Ms. Chandler's records from two visits to St. Vincent's Hospital's emergency room. (Doc. 6-12, pp. 13-44). During a visit for back pain in June 2015, a nurse noted that Birmingham Fire & Rescue Service transferred Ms. Chandler from the ambulance stretcher to a bed. (Doc. 6-12, p. 19; 6-12, p. 28). When he examined her about 35 minutes later, the emergency room doctor reported that Ms. Chandler had "[n]o trouble walking." (Doc. 6-12, p. 20). Records from a December 2014 emergency room visit do not describe Ms. Chandler's gait. (*See, e.g.*, Doc. 6-12, p. 40) (listing some physical findings, but not

Ms. Chandler's gait); (*see also* Doc. 6-12, p. 39) ("Ambulatory in ED – placed in bed").

Thus, the records that the ALJ cited establish two dates on which Ms. Chandler's gait was recorded as normal. These snapshots do not provide substantial evidence to support the ALJ's finding that Ms. Chandler's gait generally was normal, especially when her treating physician, in 2016, prescribed a cane to steady her as she walked. *See* pp. 15-16, below; (Doc. 6-12, p. 50).

### *Dr. Retan's treatment records*

In May 2013, Dr. Retan described Ms. Chandler's bilateral knee pain as "years in the making with old trauma [and] increasing knee pain that has caused her to be unable to work. This seems to be related to a past treatment of the problem with daily use of Lortab." (Doc. 6-11, p. 39; Doc. 6-12, p. 48). Dr. Retan assessed Ms. Chandler as suffering from "morbid obesity with complic[a]ting patellofemoral pain, non[-]operative disease." (Doc. 6-11, p. 39; Doc. 6-12, p. 48).[9] Dr. Retan found that Ms. Chandler "needs to lose 100 [pounds] and begin an exercise program with therapy directions." (Doc. 6-11, p. 39; Doc. 6-12, p. 48); (*see also* Doc. 6-11, pp.

---

[9] "Patellofemoral (puh-tel-o-FEM-uh-rul) pain syndrome is pain at the front of [the] knee, around the kneecap (patella)." https://www.mayoclinic.org/diseases-conditions/patellofemoral-pain-syndrome/symptoms-causes/syc-20350792 (last visited Apr. 19, 2019).

48, 50) (nurse practitioner listing knee pain and morbid obesity during December 2012 visit); (Doc. 6-12, p. 50).

In 2014, Ms. Chandler told Dr. Retan that her knees "hurt, but tolerable." (Doc. 6-12, p. 49). Ms. Chandler asked "for letter saying she can't do community service. Given probable COPD, obesity, she probably can't." (Doc. 6-12, p. 49).

Dr. Retan's notes from early 2015 state, "Norco makes knee pain sorta tolerable." (Doc. 6-12, p. 49). Later in the year when Ms. Chandler complained of knee pain, Dr. Retan increased her dosage of Norco, and Ms. Chandler reported "better pain relief." (Doc. 6-12, pp. 49-50).

In 2016, Dr. Retan wrote in his notes:

- Knees have given way on her, and she's fallen . . . but at 243 lb. 50 yrs, the orthopedists are not apt to consider her a surgical candidate. Will provide a cane.

- Knees limit her moving around, and [her] weight at 247 is a real part of problem, but not coming off.

(Doc. 6-12, p. 50). Dr. Retan did not offer an opinion concerning restrictions on Ms. Chandler's ability to walk or stand. The ALJ reported that he gave "good weight to the objective medical evidence from the claimant's treating medical sources in the relevant period." (Doc. 6-3, p. 23).

The ALJ believed that Dr. Retan's treatment record supported the RFC for light work because Dr. Retan "advised [Ms. Chandler] to exercise, which indicates that her body habitus may exacerbate her pain but does not itself limit her movement

(Exhibits B12F and B16F)." (Doc. 6, p. 24). It is true that in 2013, Dr. Retan advised Ms. Chandler to exercise, but in 2014, Dr. Retan reported that Ms. Chandler could not perform community service because of her weight, and in 2016, Dr. Retan reported that Ms. Chandler's knees gave way, that he prescribed a cane, and that Ms. Chandler's weight was a "problem, but not coming off." In addition, in 2015, Dr. Retan increased the dosage of Ms. Chandler's pain medication to address her reports of worsening pain. Thus, substantial evidence does not support the ALJ's finding, based on Dr. Retan's records, that Ms. Chandler's pain does not limit her movement.

*Daily Activities*

In discussing some of the other "overall evidence of record," the ALJ stated that Ms. Chandler "alleged severely limited activities," but the "activity level she reported at the consultative examinations" was inconsistent with her allegations. (Doc. 6-3, p. 24). The medical record contradicts the ALJ's assessment.

Dr. Gordon, Ms. Chandler's consultative psychologist, described Ms. Chandler's daily activities as follows:

> She lives alone . . . She relies on her friend to clean, do the laundry, and shop, her sister to help her with meal preparation, and her daughter to manage her finances and pay the bills. She manages her medications without reminding. She does not drive. In her leisure time she watches television and works in a puzzle book. She sees her friend every day and family members one or twice a week.

(Doc. 6-12, p. 3). Dr. Gordon stated that "[t]here was no evidence" that Ms. Chandler attempted to "embellish her symptoms or otherwise provide misleading

information." (Doc. 6-12, p. 4). As indicated, Ms. Chandler reported to Dr. Holdridge, a consulting physician, that she could cook, wash dishes, and do laundry, but she could not vacuum or mop. Ms. Chandler told Dr. Holdridge that she had no hobbies and that she spent her days watching TV or lying down. (Doc. 6-11, p. 96).

While Ms. Chandler's report of her activities to Dr. Holdridge indicates slightly more activity than her report of activities to Dr. Gordon, overall Ms. Chandler consistently reported limited daily activities. The fact that she was able to help prepare her meals and wash dishes does not undermine Dr. Holdridge's opinion that Ms. Chandler could stand and walk for only four hours with frequent breaks.

Thus, substantial evidence does not support the ALJ's conclusion that Dr. Holdridge's stand/walk restriction was inconsistent with the "overall evidence of record," and substantial evidence does not support the ALJ's exclusion from Ms. Chandler's RFC of Dr. Holdridge's four-hour restriction on walking and standing with frequent breaks. (Doc. 6-11, p. 99). The ALJ's opinion that Ms. Chandler could perform the light jobs of cashier II, power screwdriver operator, and marker, (Doc. 6-3, p. 26), is not supported by substantial evidence.

The Commissioner argues that Ms. Chandler "can show no harm" in the ALJ's failure to include a four-hour restriction on walking or standing with frequent breaks in Ms. Chandler's RFC "because the [vocational expert] testified [that] a person with Plaintiff's limitations could perform jobs existing in significant numbers in the

national economy, even with those limitations." (Doc. 11, p. 9); *see Timmons v. Comm'r, Soc. Sec. Admin.*, 522 Fed. Appx. 897, 906 (11th Cir. 2013) ("[T]he omission of a squatting restriction from the RFC assessment was harmless error" because the jobs the claimant could perform did not require squatting.). The Commissioner points out that in response to the ALJ's second hypothetical question that the VE mistakenly thought included the four-hour restriction, the VE testified that Ms. Chandler could work as an addresser, document preparer, and call out operator. (Doc. 11, p. 9). Each of those jobs is sedentary work. (Doc. 6-3, pp. 60-61). The VE explained:

> Addresser . . . sedentary . . . There's approximately 11,000 of these jobs in the national economy. Document preparer . . . sedentary . . . There's approximately 50,000 of these jobs in the national economy . . . Call out operator . . . sedentary . . . There's approximately 10,000 of these occupations.

(Doc. 6-3, pp. 60-61).[10] As noted above, sedentary jobs are included within the light classification. *See* p. 6, above.

---

[10] The VE also testified initially that Ms. Chandler could perform her previous work as a child monitor because "although it is rated at medium, I believe that would afford her the ability to not have to stand, you know, for –" (Doc. 6-3, p. 60). The vocational expert later stated that when limiting the ALJ's second hypothetical question to light jobs, child monitoring would not qualify because it is a medium position. (Doc. 6-3, p. 65). The VE stated that "with only standing and walking in a combination of four hours a day," other than the three sedentary jobs identified, there would be no other jobs that Ms. Chandler could perform. (Doc. 6-3, p. 60). Other jobs would be available only if the ALJ "[r]emov[ed] the standing limitation and walking limitation in combination of four hours." (Doc. 6-3, p. 63); (*see also* Doc. 6-3, p. 64).

The testimony on which the Commissioner relies is part of the fifth step in the sequential evaluation process. At step five, the Commissioner bears the burden of determining "if there is other work available in significant numbers in the national economy that the claimant is able to perform." *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). To carry this burden, an ALJ "must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). "[F]or a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson*, 284 F.3d at 1227.

The Court is not persuaded that the ALJ's analysis at the fifth stage of the sequential evaluation process rests on substantial evidence because the ALJ struggled to articulate a hypothetical that encompassed all of Ms. Chandler's limitations. The transcript of the conversation between the ALJ and the VE reveals a string of successive statements in which the ALJ adjusted his hypothetical questions to address miscommunications and misunderstandings between himself and the VE. The following exchange concerning the first of four hypotheticals illustrates the point:

> Q. This individual has no exertional limitation, has no limitation of sitting. The individual can stand or walk in combination up to four hours in an eight hour day with frequent breaks. The individual can occasionally climb stairs or ladders, stoop, kneel, crouch or crawl.

Additionally, this individual can understand and remember simple instructions. The individual can carry out simple instructions and sustain attention to routine or familiar tasks for extended periods. This individual can tolerate light work pressure, light not referring to exertion, but the level of stress . . . [T]he individual should avoid rapid changes and multiple demands. Any contact that this individual has with the public or co-workers should be no more than 30 minutes at one time. The individual can accept and respond to feedback that is supportive and can adapt to infrequent, well explained changes in the work setting or expectations.

Given those limitations and I'm already having second thoughts even though I haven't heard from you about this statement I made about light work pressure. Let me delete that. Let me add instead no production quota. I think that would be something that you could address more readily in vocational terms, but given that combination would this hypothetical individual be able to perform any of the three jobs you identified earlier?

A.     You honor, could I please get some clarification on the frequent breaks? And, my question is are they in excess of the typical 15 minute break mid-morning, 30 minute lunch break –

Q.     . . . I think it's a good question . . . I'm going to have to try to explain that. I can't say with certainty that it's frequent as used in the *Dictionary of Occupational Titles* terminology, but this is a statement, let me see if I can see anything that exemplifies on that. . . . Well, the physician who made the statement gave a rationale about frequent breaks given obesity, probable osteoarthritis and back pathology. I don't think that really is going to help you very much . . . I guess, you know, everyone might have their own definition, but you're going to have to take it in that context and in the context of the other limitations that were set forth. I mean frequent is going to mean something different to everyone and I'll just ask you to try to read all of these limitations together . . . Or maybe you may want to specify something about frequent in vocational terms such that, you know, if it exceeded a certain amount or was less. However you feel you can address it. You may want to explain somewhat based on your interpretation of those limitations, could this individual perform any of those three jobs?

A.    I'm still hung up on the frequent breaks.

. . .

Q.    Let me explain my hypothetical more.  Even though it says four hours in an eight hour day of standing and walking combined, with frequent breaks.  And, I don't know how long they might be, but we also have the occasional climbing of stairs or ladders, stooping, kneeling, crouching or crawling.  I would say that the frequency should not be such that it would prevent the occasional performance of those other activities because it has to be construed together.  I don't know that I can offer much more.  I will have some other hypotheticals, but I'm taking this as it was presented.

A.    Yes, sir.

Q.    It would have been nice to have the good doctor here, but we do not.

(Doc. 6-3, pp. 56-59).[11]

The conversation between the ALJ and the VE concerning the meaning of the term "frequent breaks" reveals flaws in the ALJ's analysis of the medical evidence for several reasons.  First, the ALJ attributed the requirement of frequent breaks only to Dr. Holdridge's functional assessment and indicated that the breaks related only to obesity, probable osteoarthritis, and back pain.  But Dr. Holdridge was not alone in recommending breaks for Ms. Chandler.  Dr. Williams completed a mental assessment of Ms. Chandler without examining her.  (Doc. 6-4, pp. 2-17).  Dr.

---

[11] The entire discussion of hypotheticals spans over 12 pages of the hearing transcript.  (Doc. 6-3, pp. 55-68).

Williams stated that Ms. Chandler "would benefit from regular rest breaks and a slowed pace" because of limits on Ms. Chandler's concentration and persistence. (Doc. 6-4, p. 13). Dr. Williams explained:

> [Claimant] could carry out simple instructions, sustain attention to routine/familiar tasks for extended periods. [Claimant] could tolerate light work pressures and should avoid rapid changes and multiple demands. [Claimant] would benefit from regular rest breaks and a slowed pace.

(Doc. 6-4, p. 13). The ALJ assigned significant weight to Dr. Williams's report as "the only comprehensive assessment of [Ms. Chandler's] mental functioning." (Doc. 6-3, p. 24).[12] Therefore, there was consensus that Ms. Chandler required rest breaks both for physical and psychological reasons, a point that the ALJ overlooked in formulating hypotheticals concerning Ms. Chandler's limitations.

Second, an ALJ has not only a duty at step five to pose a comprehensive hypothetical but also a general obligation "to develop the record where appropriate." *Robinson v. Astrue*, 365 Fed. Appx. 993, 999 (11th Cir. 2010) (internal citation omitted). Under Social Security Ruling 96–5p, "an ALJ should recontact a claimant's treating physician if the evidence in the record is otherwise inadequate to determine whether the claimant is disabled." *Robinson*, 365 Fed. Appx. at 999.

---

[12] Dr. Gordon, the psychologist who examined Ms. Chandler once, similarly concluded that Ms. Chandler's "concentration, attention to detail, and work pace are likely to be poor due to psychological issues, chronic pain, and sleep insufficiency." (Doc. 6-12, p. 4). The ALJ assigned some weight to Dr. Gordon's opinions. (Doc. 6-3, p. 25).

Ruling 96-5p states that if "the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." *Robinson*, 365 Fed. Appx. at 999 (quoting Ruling 96-5p). When the failure to do so produces "unfairness or clear prejudice," the error is not harmless. Here, the VE did not understand what the ALJ meant by "frequent breaks," and the ALJ acknowledged the need for clarification from Dr. Holdridge, but the ALJ did not attempt to consult Dr. Holdridge. The ALJ defaulted to advising the VE: "frequent is going to mean something different to everyone and I'll just ask you to try to read all of these limitations together." (Doc. 6-3, p. 58). Ultimately, in expressing opinions about both the first and second hypotheticals, the VE did not mention frequent breaks but instead discussed only the four hour walk/stand limitation. (Doc. 6-3, pp. 60-64).

Because the hypothetical questions on which the Commissioner relied were confusing and incomplete, and because the ALJ's failure to recontact Dr. Holdridge or even consider Dr. Williams's opinion regarding Ms. Chandler's need for breaks rendered the hypotheticals unfair and unreliable, the VE's testimony concerning available work does not constitute substantial evidence, and the ALJ's errors are not harmless.

## V.    CONCLUSION

For the reasons discussed above, the Court remands the Commissioner's decision for additional proceedings consistent with this opinion. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this 15th day of October, 2019.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE